IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

VERNON CAPSHAW                                                                        PLAINTIFF

        v.                              Civil No. 6:09-cv-06070

CAPTAIN MEL STEED, Garland
County Detention Center; LT.
RADLEY, Garland County Detention
Center; SHERIFF LARRY SANDERS;
FORMER SGT. ROWE; DEPUTY
JOSH CANNON, Garland County
Detention Center                                                                   DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Plaintiff, Vernon Capshaw (hereinafter Capshaw), filed this case pursuant to the provisions of 42 U.S.C. § 1983.  He proceeds *pro se* and *in forma pauperis*.

Capshaw is currently an inmate of the Arkansas Department of Correction (ADC).  This lawsuit is about the conditions under which Capshaw was confined while at the Garland County Detention Facility (GCDF) from March 6th to March 8th, 2008, while confined to cell H-4.

An evidentiary hearing was held on June 28, 2011.  The case is now ready for decision.

## I.  BACKGROUND

The testimony of the following witnesses was taken:  (1) Deputy Josh Cannon, a named Defendant; (2) Former Sergeant Linda Rowe, a named Defendant; (3) Captain Mel Steed, a named Defendant; (4) Keith Smith; (5) Courtney Henry; (6) Vernon Capshaw, the Plaintiff; and (7) Billy Capshaw.  For purposes of discussion, the testimony of the witnesses will be summarized.

### Deputy Josh Cannon

Cannon is a named Defendant and was a deputy in the jail in March of 2008.  He was one of

the deputies who placed Capshaw in cell H-4.  At the time, Cannon testified he worked a three p.m. to midnight shift.  He stated that Capshaw had been placed in H-4 at around 9 p.m. as a disciplinary measure.  Cannon did not recall seeing any feces on the wall in the cell and did not recall Capshaw talking about there being feces on the wall.  Cannon believed he would have noticed feces on the wall and had he been aware of it Cannon stated he would have had it cleaned up by trustees.

Cannon did receive a grievance from Capshaw on March 6th that complained about the lock-down and also indicates there was feces on the wall.  *Plaintiff's Exhibit* 1.  Cannon responded indicating that they were no longer going to pamper Capshaw and allow him to act like a kid.  *Id.* Cannon stated the punishment would stay the same.  *Id.*  Cannon responded to the grievance between 10:30 p.m. and 11:00 p.m.  *Id.*  Cannon indicated that the would pass the grievance onto the Captain and Lieutenant so they knew what was going on.  *Id.*  At the time, Cannon indicated he would have passed the grievance onto Captain Steed and Lieutenant McMurrian and to the Sergeant.  A copy of the grievance was placed in the jail file.

When a disciplinary is given, Cannon testified that a disciplinary board made up of deputies decides on the appropriate punishment.  He indicated there were four cells they typically used for lock-downs and H-4 was empty at the time.  H-4 actually consists of a small day room area containing a table and two cells 401 and 402.  To access the area, the hallway door must be unlocked which places you in the day room area with the table.  To access the individual cells, an inner door must be unlocked.  When an inmate is being placed in one of the cells, Cannon testified you check and make sure there is nothing in the cell.  Cannon testified that Capshaw was placed in cell 402 on the right side.

Cannon believed there was both a night light and a day light in the cell above the toilet.  The

light outside the room was always on.  There is video monitoring of the holding cells.  Cannon could not recall anyone checking the video.  In any event, Cannon testified you might be able to see if something was smeared on the wall but you would not be able to tell what it was.

Cannon could not recall there being any specific leaking or flooding problems in cell 402. He testified there was a padded material on the wall and inmates had ripped holes in the material. Cannon could not recall if the toilet worked in cell 402 at that time.  However, he testified accommodations were made  if the water was turned off to the cell.  Cannon indicates the jailers would go around at medication distribution times and dinner and give the inmate water to flush the toilet and drink.

Nine rounds were made throughout the night.  Cannon testified there was a sheet of paper on the door that contained a checklist so each jailer knew what needed to be done.

The cell was cleaned by trustees.  If a drunk created a mess, the trustees would clean the cell with a deputy.  Trustees were available to clean twenty-four hours a day.  Cannon believed that the day shift also passed out cleaning materials.  The earliest cleaning materials were passed out would have been the morning of March 7th.

**Former Sergeant Rowe**

Rowe testified she was a sergeant at the jail in March of 2008.  At the time, she testified she was basically the supervisor in charge of the night shift.

According to Rowe, Capshaw was a problem on almost a daily basis.  She testified he had been moved several times to different cells and each time within seventy-two hours he had torn the cell up.  She indicated he had even torn the lights up on several occasions.

Rowe indicated the holding cells were cleaned daily.  The trustees were also available to

-3-

clean.  Additionally, she testified cleaning supplies, including a disinfectant, were furnished to the inmates daily during the 7 a.m. day shift.  The supplies were passed out to the holding cells one at a time.  In the larger blocks, the cleaning supplies were left out for two to three hours.

Rowe testified all four holding cells can be monitored.  The video provides a record of people going in and out of the cells.  Rowe testified she did not believe the video would show something smeared on the wall.

On March 7th sometime between 3 p.m. and 7 a.m., Rowe testified a deputy brought her a grievance form from Capshaw.  *Plaintiff's Exhibit* 2.  He asked why he was in a cell with no water, a leaking roof, and feces on the walls.  *Id.*  He asked to be put in H-2 or back into pod B-1 for the remainder of his lock-down.  *Id.*  He stated being in that cell constituted cruel and inhumane punishment.  *Id.*

When she got the grievance, Rowe indicated she probably would have asked the deputies in back about the cell and whether there were any leakage or other problems.  Rowe could not recall why the water was off.  At the time, there would have been four to five deputies working in the cell area.  Rowe testified she tried to keep four deputies in the back and checking the holding cells at least once an hour and more if possible.  She could not recall if H-4 leaked at the wall area.

Rowe responded to the grievance as follows:  "Our jail problems are results of inmates such as yourself who have no regard for others property.  Maybe you didn't spread stuff on the walls or tear up plumbing, but you have done your share of destroying property damage."  *Plaintiff's Exhibit* 2.

Rowe did not recall having seen Capshaw's March 6th grievance.  She did not know what Capshaw was being disciplined for.  She did state there were a number of reasons he could have been

placed in H-4 cell 402 including it having been the only cell available.     Rowe testified she did not know if the water was off because Capshaw was threatening to floor the cell or if someone else was.

**Captain Steed**

Steed testified he had been the jail captain for seven years.  He was sure he had looked at the two grievances submitted by Capshaw in March of 2008.  Steed indicates he would have received copies of the grievances and would have been concerned about the situation; however, he testified the sergeants and lieutenants were allowed to handle grievances.

He indicated there had been problems with the plumbing in the jail which required the water to be turned off.  However, he could not recall if the water was off in March of 2008.

When the water was turned off, inmates continued to use the toilets and a bucket of water was used to flush the toilets. This was done once a shift.  However, if a deputy was asked, Steed indicated he was sure the deputy would supply a flush bucket again.  On any given day, Steed testified there would be at least ten to fifteen cells in which the toilets did not work.

Inmates in holding cells were checked at least once an hour.  To check on the inmates the deputies unlocked the outer door and use the bean hole to look in the cell.  Steed testified that you could not do a thorough inspection of the of the cell through the bean hole.

If there was feces on the wall, the inmate would be removed from the cell and the trustees would clean the cell.  The trustees were available twenty-four hours a day and were cleaning constantly.  A maintenance man works eight to ten hours a day fixing problems at the jail.

To Steed's knowledge, H-4 never leaked.  However, Steed testified there were problems with the jail roof leaking.

Steed testified the holding cell has a raised area where a mattress is placed.  According to

-5-

Steed, the holding cell should have been checked before anyone was placed in it.  If Capshaw had refused to clean, the trustees would clean the cell.  While the trustees clean, a deputy is present.  If Capshaw was doing the cleaning himself, the trustees would be dismissed.

According to Steed, the video recordings are only held for fifteen days and then recorded over. He believed the use of a check list on the door of the holding cells had only been implemented about two years ago.

Steed indicated there were a number of reasons that Capshaw could have been placed in a holding cell.  If he was placed there for disciplinary reasons, Steed testified the disciplinary charge would be reviewed by the disciplinary board within seventy-two hours.

If an inmate destroys jail property, the inmate is charged the cost of the item destroyed. However, Steed testified there are many times when the jail does not get reimbursed.

**Keith Smith**

Smith testified he was incarcerated in the GCDF in March of 2008 until an unspecified date in 2010 when he was transferred to the ADC.  Although he could not recall the dates, Smith testified that during his incarceration he was housed in both H-1 and H-4.  According to Smith, both cells had problems.  He testified the roof leaked in H-4, there was feces on the wall and floor, and the water was shut off for a month.  Smith did not submit a grievance about the conditions in the cell.

Smith testified he was in H-4 in a one man cell for one and half to two months.  During this time, he indicated he urinated in the sink and defecated in the stool.  Buckets would be brought to flush the toilet.  He indicated he was not provided with cleaning supplies while in the holding cell.

**Corporal Courtney Henry**

Henry testified she worked as a jail corporal from June of 2006 until June of 2009.  During

this time she testified she worked in booking frequently.  If she was not in booking, she testified she would have been working with the females.  If she needed to move a male inmate, Henry testified a male deputy would be with her.

Henry could not recall Capshaw complaining about feces on the wall or about the cell.  She believed she would recall if there was feces in a cell.  Henry stated she had never come across feces on the wall of a cell.

When a toilet was not working. the toilet was flushed by dumping a bucket of water down it. Henry testified it was rare when this had to be done.

When grievances were submitted, Henry testified she would review them to see if there was an emergency situation.  If it was, she took care of it.

There was a small day room outside of the two cells in H-4.  The cleaning supplies were put in the day room and then the inner cell door unlocked.  The supplies consisted of a water bucket with bleach in it.

**Vernon Capshaw**

Capshaw testified he was incarcerated at the GCDF from the end of 2007 until mid-2009. During his incarceration, Capshaw indicated there were numerous times he was placed in a holding cell for a variety of reasons including fighting.

Capshaw believed he had been in all the holding cells.  He did not have problems until he was placed in H-4 in March of 2008.  Specifically, Capshaw testified that on March 6, 2008, he was charged with destroying a mat and was moved to H-4 by Cannon.  Capshaw stated the move occurred before lock down and while it was still daylight.  Capshaw testified that he noticed the feces on the wall, wrote a grievance, and gave it to Cannon.  Cannon later brought the grievance back to him with

the response written on it.  Capshaw also maintains he verbally told Cannon and others about the problems.

When you stepped into the cell, Capshaw indicated the toilet and sink combination unit was to the left.  A bunk was along the far wall across from the door.  The hole in the padding on the wall was on the right side a little above waist high.  Capshaw stated he put his head as far away from the hole as he could.

According to Capshaw, the cell also had a leak.  He testified it was a steady drip on the left side of the bunk.  The water then ran off the bunk and onto the floor.  He indicated there were puddles on the floor a couple feet in diameter.

Capshaw indicates he defecated in the toilet on the afternoon of March 7th and no bucket was brought in to flush the toilet.  He states there was enough feces on the wall to make the cell smell.

The inside of the cell had padded walls.  According to Capshaw, there was feces stuffed inside a hole in the wall that was approximately a foot wide or slightly bigger.  The hole was located six to eight inches from the bed.  There was also a "little" feces around the bean hole and on the floor.  While the feces was dried, Capshaw stated it still smelled.  To him, it looked like the feces had been there for some time.[1]

The following day, Capshaw stated he submitted another grievance.  On March 8th, Capshaw testified Henry came by with two trustees and saw the feces on the wall and moved him.  He believed the move came around noon or a short while later.  He was moved to another holding cell because he was still on lock down.  The toilet worked in the cell he was moved to.  After he served out his

---

[1] On June 27, 2011, I visited the GCDF and was shown cell H-4.  At the time of my visit, the toilet and sink were operable and no feces was present.  It did appear that at one time there had been a leak in the cell.

disciplinary, Capshaw was moved back to B-pod.

Capshaw could not recall anyone checking on him every hour.  He thought he may have been checked at pill call and at meal time.  He suffered no physical injuries as a result of the conditions in the cell.

With respect to the provision of cleaning supplies, Capshaw testified that the inmates in the holding cells only got supplies every once in a while--approximately once every two weeks if you pressed the issue.  While he was in H-4, Capshaw stated he asked for, but was refused, cleaning supplies.  In the jail pods, Capshaw indicated cleaning supplies were brought around on a regular basis.

With respect to Lieutenant Radley, Capshaw testified Radley should have been aware of the situation because the grievances were passed onto him.  With respect to Sheriff Sanders, Capshaw maintained he should be aware of the problems the jail had and made sure no one was housed in H-4.  As far as Capshaw knew, Sheriff Sanders did not know he was placed in H-4.

**Billy Capshaw**

Billy Capshaw testified that Vernon is his son.  According to Billy Capshaw, he begged people at the GCDF to move his son out of the cell with the fecal matter and no water.  He recalled speaking to a female sergeant on the phone who told him that his son would be kept in the cell until he learned to behave.  Billy Capshaw had no personal knowledge regarding the conditions in the cell, could not recall when his son had told him about the conditions in the cell, and could not recall the name of the female sergeant he spoke to.

## II.  DISCUSSION

"[W]hen the State takes a person into its custody and holds him there against his will, the

Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *County of Sacramento v. Lewis*, 523 U.S. 833 (1998)(citation omitted). The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994). In cases involving both pre-trial detainees and convicted inmates, the Court of Appeals for the Eighth Circuit has repeatedly applied the deliberate indifference standard of the Eighth Amendment. *See e.g., Morris v. Zefferi*, 601 F.3d 805, 809 (8th Cir. 2010); *Butler v. Fletcher*, 465 F.3d 340, 345 (8th Cir. 2006)(deliberate indifference standard of the Eighth Amendment applies to all claims that prison officials failed to provide adequate food, clothing, shelter, etc., whether brought by pretrial detainees or convicted inmates).

The Eighth Amendment to the United States Constitution prohibits the imposition of cruel and unusual punishment. U.S. Const. amend. VIII; *see also*. The Cruel and Unusual Punishment Clause of the Eighth Amendment "prohibits penalties that transgress today's broad and idealistic concepts of dignity, civilized standards, humanity, and decency. Punishment that deprives inmates of the minimal civilized measures of life's necessities is unconstitutional." *Morris*, 601 F.3d at 809 (internal quotation marks and citations omitted).

To prevail on a conditions-of-confinement case, Capshaw must show: (1) the condition was serious enough to deprive him of the minimal civilized measures of life's necessities or to constitute a substantial risk of serious harm; and (2) officials were deliberately indifferent to his health and safety. *Smith v. Copeland*, 87 F.3d 265, 268 (8th Cir. 1996).

Keeping these principles in mind, I turn to an examination of the conditions of confinement that exist in this case. I find credible Capshaw's testimony that he was confined to a cell with no running water, a leaking roof, and human feces on the wall from late afternoon on March 6, 2008,

to mid-day on March 8, 2008.  In evaluating whether an inmate's exposure to unsanitary conditions is unconstitutional, the Court is to focus on the length of the exposure to unsanitary conditions and how unsanitary the conditions were.  *See Owens v. Scott County Jail*, 328 F.3d 1026, 1027 (8th Cir. 2003)(*citing Hutto v. Finney*, 437 U.S. 678, 686-87 (1978)); *see also Whitnack v. Douglas County*, 16 F. 3d 954, 958 (8th Cir. 1994)(length of time required for conditions to be unconstitutional decreases as level of filthiness increases).   The Eighth Circuit has noted a need to be "especially cautious about condoning conditions that include an inmate's proximity to human waste." *Fruit v. Norris*, 905 F.2d 1147, 1151 (8th Cir. 1990).

However, I also find credible the testimony of Cannon and Rowe that inmates were offered opportunities to clean on a regular basis, deputies had the use of trustees for cleaning purposes, and when toilets were non-operable buckets of water were provided to flush the toilets.  Capshaw had limited exposure to the unsanitary conditions--less than forty-eight hours.  He did not become ill or sustain any physical injury as a result of the conditions.  He does not maintain he was "exposed to disease or suffered any other consequences of the exposure." *Smith v. Copeland*, 87 F.3d 265, 268 (8th Cir. 1996).  I do not believe the conditions in the cell deprived Capshaw of the minimal civilized measures of life's necessities or constituted a substantial risk of serious harm.

Additionally, the evidence is simply insufficient to show deliberate indifference on the part of Cannon or Rowe.  Capshaw has not shown they were "deliberately indifferent to the risk of harm posed" by the conditions in the holding cell. *Smith*, 87 F.3d at 268.

Further, I find no deliberate indifference exists on the part of Captain Steed, Lieutenant Radley, or Sheriff Sanders.  Capshaw maintains these individuals "should have known" about the conditions either because they received copies of his grievances and/or are responsible for conditions

-11-

at the jail.  There is no evidence that these individuals were personally involved in placing Capshaw into H-4 or that were even aware of the conditions during Capshaw's confinement in H-4. "[C]onstructive knowledge, or the should-have-known standard, is not sufficient to support a finding of deliberate indifference."  *Spruce v. Sargent*, 149 F.3d 783, 786 (9th Cir. 1998).   At the summary judgment stage, all official capacity claims were dismissed.

### III.  CONCLUSION

    For the reasons stated, I recommend that judgment be entered in the Defendants' favor and the case be dismissed with prejudice.

    **The parties have fourteen (14)  days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

    DATED this 12th day of September 2011.


                    /s/ *J. Marschewski*
                     HON. JAMES R. MARSCHEWSKI
                     CHIEF UNITED STATES MAGISTRATE JUDGE